UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LAWRENCE CALLAHAN, individually and
as Trustee of the LAWRENCE CALLAHAN
ROTH IRA,

        Plaintiff,        18-cv-8343 (PKC)

    -against-           OPINION
                    <u>AND ORDER</u>

GLOBAL EAGLE ENTERTAINMENT INC.
and AMERICAN STOCK TRANSFER &
TRUST COMPANY, LLC,

        Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

    Plaintiff Lawrence Callahan, individually and as a Trustee of the Lawrence Callahan Roth IRA ("Callahan"), filed his First Amended Complaint (the "Complaint") against Defendants Global Eagle Entertainment, Inc. ("Global Eagle") and American Stock Transfer & Trust Company, LLC ("AST") alleging one count of breach of contract. Defendants have moved, pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss the Complaint for failure to state a claim upon which relief may be granted. For reasons that will be explained, the Court will grant defendants' motion to dismiss.

BACKGROUND

    The following facts are drawn from Callahan's First Amended Complaint as well as from the materials attached to and incorporated by reference into the pleading. See <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002). For the purposes of defendants' motion, all non-conclusory factual allegations in Callahan's First Amended Complaint are accepted as true, and all reasonable inferences are drawn in favor of Callahan as the non-movant. <u>See</u>

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

Callahan is a U.S. citizen who resides in St. Louis County, Missouri. (Compl't ¶ 1). He is Trustee of the Lawrence Callahan Roth IRA. (Id. ¶ 2). Defendant Global Eagle is a Delaware corporation with a principle place of business in California. (Id. ¶ 3). It provides content, connectivity, and digital media solutions to the travel industry. (Id. ¶ 7). Shares of Global Eagle are publicly traded on the NASDAQ. (Id. ¶ 8). Defendant AST is a New York limited liability trust company with a principle place of business in New York. (Id. ¶ 4). Pursuant to a "Warrant Agreement," Callahan owns stock warrants that were issued by Global Eagle in 2011. (Id. ¶ 9). The Agreement provides that AST is Global Eagle's warrant agent. (Id. ¶ 10). In that capacity, AST is responsible for issuing, registering, transferring, exchanging, redeeming, and exercising the stock warrants issued by Global Eagle. (Id.).

Upon execution of the warrants, a warrant holder is entitled to "purchase from [Global Eagle] the number of shares of Common Stock stated [in the warrant], at the price of $11.50 per share" regardless of the price at which the common stock is currently trading. (Id., Ex. 1 § 3.1). Such an entitlement has advantages where, for instance, the common stock is trading at a price higher than $11.50 (the "exercise price"), in which case, the warrant holder is entitled to purchase shares of common stock at a "discounted" price. A warrant holder can only exercise his stock warrants in this manner if "a registration statement under the Securities Act with respect to the shares of Common Stock underlying the [warrants] is then effective." (Id., Ex. 1 § 3.3.2)

Global Eagle is required to file with the Securities and Exchange Commission ("SEC") a "registration statement for the registration, under the Securities Act, of the shares of

Common Stock issuable upon exercise of the Warrants." (Id., Ex. 1 § 7.4). Under section 7.4, if Global Eagle fails to maintain such an effective registration statement, warrant holders have the right to exchange their warrants on a "cashless basis" for "that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the Warrants, multiplied by the difference between the Warrant Price and the 'Fair Market Value' . . . by (y) the Fair Market Value."[1] (Id.). Global Eagle's registration statement became ineffective sometime in late 2016, when the SEC suspended the registration statement due to Global Eagle's failure to adhere to its periodic reporting requirements. (Id. ¶¶ 11, 12, 13).

The Warrant Agreement was set to expire on January 31, 2018. (Id. ¶ 17). Shortly before the expiration date, on December 27, 2017, Callahan wrote to AST formally requesting to convert 100,000 stock warrants that he personally owned, and 942,675 stock warrants that he owned through his Roth IRA account into shares of Global Eagle common stock on a "cashless" basis, citing the ineffective registration statement and section 7.4 of the Warrant Agreement. (Id. ¶ 18, Ex. 2 at 1). At the time of Callahan's request, shares of Global Eagle common stock were trading at $2.50 each and the exercise price was still $11.50. (Id. ¶¶ 19, 20). Using these figures, and the formula in section 7.4, Callahan calculated that his 1,042,675 warrants entitled him to 3,753,630 shares of common stock via a "cashless exercise." (Id. ¶ 22, Ex. 2 at 4).

In response to Callahan's letter, Global Eagle stated that it would not honor the cashless exercise because the warrants were "out of [the] money." (Id. ¶ 21). As defendants

---

[1] The "Warrant Price" means the same as the "exercise price," which is $11.50 pursuant to the Warrant Agreement. The Court will use the terms "warrant price" and "exercise price" interchangeably.

explain: "if the market price of the underlying stock rises above the exercise price, a holder can buy the stock at a discount to its market price, with the difference representing a profit to the holder. Such a warrant is said to be 'in the money.' If, on the other hand, the market price sinks below the exercise price, exercising is economically detrimental, as it would require the warrant holder to overpay for stock that he or she could buy for less on the open market. This is referred to as the warrant being 'out of the money' or 'underwater.'" (Def. Br. at 1).

AST did not execute the cashless transaction and Global Eagle did not deliver the requested shares of Common Stock to Callahan. (Id. ¶¶ 26-27). Global Eagle agrees with Callahan that at the time Callahan requested a cashless exercise, it did not have the required effective registration agreement as described in section 7.4. However, it argues that the cashless exercise option is only available when the Fair Market Value exceeds the Warrant Price, not when, as here, the Warrant Price ($11.50) exceeds the Fair Market Value ($2.50). Callahan brought suit for breach of the Warrant Agreement against Global Eagle and AST.

LEGAL STANDARD

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth. Id. Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to

an entitlement to relief." Id. at 679. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

DISCUSSION

To establish a breach of contract under New York law,[2] a plaintiff must prove (1) the existence of a contract; (2) performance of the contract by one party; (3) breach of the contract by the other party; and (4) damages. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract [insofar as they are material to the dispute] are unambiguous." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016). "Whether a contract is ambiguous is a question of law for the court to decide." Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 53 (2d Cir. 2012) (citation omitted).

"Ambiguity is determined by looking within the four corners of the document, not to outside sources." JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (citation omitted). "Courts analyze the ambiguity of a contract provision under the 'normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions.'" Carlton Grp., Ltd. v. Mirabella SG SpA, No. 16-CV-6649 (LGS), 2017 WL 3530370, at *4 (S.D.N.Y. Aug. 16, 2017).

---

[2] The parties agree that New York law governs. (See Pl. Br. at 2).

- 5 -

"[I]n deciding whether an agreement is ambiguous[,] courts 'should examine the entire contract and consider the relation of the parties and the circumstances under which [the contract] was executed. Particular words should be considered[], not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.'" Kass v. Kass, 91 N.Y.2d 554, 566 (N.Y. 1998) (citation omitted); see, e.g., S. Rd. Assocs., LLC v. Int'l Bus. Machines Corp., 4 N.Y.3d 272, 278 (N.Y. 2005) (holding that the term "premises" in the disputed contract unambiguously referred only to the "interior space" of a leased real estate property based on a reading of the lease "as a whole," which frequently listed the term "premises" separately from things such as "the water tower, appurtenances, land, parking lot and building").

"Ambiguity in a contract is the inadequacy of the wording to classify or characterize something that has potential significance." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004). "A contract is unambiguous . . . if the contract language has a definite and precise meaning . . . and concerning which there is no reasonable basis for a difference of opinion." Orchard Hill, 830 F.3d at 156 (citation and internal quotation marks omitted). Ambiguity does not exist "where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'" Bank of New York Mellon Tr. Co, N.A. v. Gebert, No. 13-CV-6988 (PKC), 2014 WL 1883551, at *3 (S.D.N.Y. May 9, 2014) (citing Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)).

"Where there is no ambiguity to a contract and the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may be resolved on a motion to dismiss." Rounds v. Beacon Assocs.

Mgmt. Corp., No. 09-CV-6910 (LBS), 2009 WL 4857622, at *3 (S.D.N.Y. Dec. 14, 2009). "[A] contract 'must be enforced according to the plain meaning of the language of the contracting parties'" and construed "so as to give full meaning and effect to all of its provisions" and "in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." Gebert, 2014 WL 1883551, at *3 (citation omitted); Atlas Partners, LLC v. STMicroelectronics, Int'l N.V., No. 14-CV-7134 (VM), 2015 WL 4940126, at *5–6 (S.D.N.Y. Aug. 10, 2015) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005)); Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd., 327 F. Supp. 3d 673, 680–81 (S.D.N.Y. 2018) (citation omitted). "A court should not interpret a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" Gebert, 2014 WL 1883551, at *3 (citing In re Lipper Holdings, LLC, 766 N.Y.S.2d 561, 562 (1st Dep't 2003)); see also Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir. 1986) ("Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.").

In this case, the contract dispute hinges on the meaning of the term "difference" in the "cashless exercise" provision found in section 7.4 of the Warrant Agreement. The issue is whether the term "difference" in the phrase "difference between the Warrant Price and the 'Fair Market Value'" means (1) the result of subtracting the Warrant Price from the Fair Market Value, as Global Eagle argues, or (2) the distance between the Warrant Price and the Fair Market Value, as Callahan argues. To answer this question, the Court does not look merely at the word "difference" as it appears in the quoted phrase but by also considering the mechanism through which a "cashless exercise" operates, as evidenced by the Warrant Agreement as a whole. This mechanism makes plain sense under Global Eagle's interpretation, but is rendered meaningless

and arbitrary under Callahan's interpretation. Thus considering the entirety of the Warrant Agreement, the Court reads the phrase "difference between the Warrant Price and the Fair Market Value" to require subtracting the Warrant Price from the Fair Market Value.

The disputed cashless exercise formula is found in section 7.4. It reads, in pertinent part, as follows:

> The Company agrees that as soon as practicable, but in no event later than fifteen (15) Business Days after the closing of its initial Business Combination, it shall use its best efforts to file with the Commission a registration statement for the registration, under the Securities Act, of the shares of Common Stock issuable upon exercise of the Warrants . . . . The Company shall use its best efforts to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the Warrants in accordance with the provisions of this Agreement. If any such registration statement has not been declared effective by the 60th Business Day following the closing of the Business Combination, holders of the Warrants shall have the right, during the period beginning on the 61st Business Day after the closing of the Business Combination and ending upon such registration statement being declared effective by the Commission, and during any other period when the Company shall fail to have maintained an effective registration statement covering the shares of Common Stock issuable upon exercise of the Warrants, to exercise such Warrants on a "cashless basis," by exchanging the Warrants (in accordance with Section 3(a)(9) of the Act or another exemption) for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the Warrants, multiplied by the difference between the Warrant Price and the 'Fair Market Value' (as defined below) by (y) the Fair Market Value."[3]

---

[3] Section 3(a)(9) of the Securities Act of 1933 exempts from "the provisions of this subchapter" any security "exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange . . . ." 15 U.S.C. § 77c(a)(9). One such provision of the same subchapter states that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly . . . to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise." 15 U.S.C. § 77e(a)(1).

(Compl't, Ex. 1 § 7.4).  The parties agree that in this case "the number of shares of Common Stock underlying the Warrants" is equal to the total number of warrants that the warrant holder, here Callahan, seeks to exercise, which is 1,042,675.  (Pl. Br. at 5; Def. Br. at 9, 14).  The following equations represent (1) Global Eagle's and (2) Callahan's interpretations of the section 7.4 formula, respectively:

(1) Global Eagle's Interpretation:

$$Shares\ of\ Common\ Stock = \frac{(Number\ of\ Warrants)(Fair\ Market\ Value - Warrant\ Price)}{Fair\ Market\ Value}$$

(2) Callahan's Interpretation:

$$Shares\ of\ Common\ Stock = \frac{(Number\ of\ Warrants)|Fair\ Market\ Value - Warrant\ Price|}{Fair\ Market\ Value}$$

As discussed, the two interpretations differ in that the first requires subtracting the Warrant Price from the Fair Market Value, represented by "$(Fair\ Market\ Value - Warrant\ Price)$," whereas the second requires finding the distance between the Fair Market Value and the Warrant Price (a value which is always positive), represented by "$|Fair\ Market\ Value - Warrant\ Price|$."[4]  If the first interpretation is correct, Global Eagle prevails because applying the first equation yields a negative number of "Shares of Common Stock," which implies that

---

[4] The expression "$|Fair\ Market\ Value - Warrant\ Price|$" represents the absolute value of subtracting the Warrant Price from the Fair Market Value, i.e., the distance between the Fair Market Value and the Warrant Price, which is necessarily a positive value.

Global Eagle would owe Callahan no shares in exchange for his warrants.[5] If the second interpretation is correct, Callahan prevails because applying the second equation yields 3,753,630 in shares of common stock, which is the number of shares requested by Callahan.[6]

It is true, as Callahan argues, that the phrase "difference between the Warrant Price and the 'Fair Market Value'" does not itself describe whether the Warrant Price should be subtracted from the Fair Market Value or vice versa. (Pl. Br. at 1). However, the language of the Warrant Agreement does not become ambiguous "simply because the parties urge different interpretations." See Gebert, 2014 WL 1883551, at *3. Here, even if the term "difference" may be interpreted in two ways when reading this phrase in isolation, the Court may properly dismiss Callahan's claim because the term "difference" does not "suggest more than one meaning" when "examin[ing] the context of the entire integrated agreement," including the Warrant Agreement and the Warrant Certificate, which the Warrant Agreement explicitly incorporates. See Bayerische Landesbank, 692 F.3d at 53 (emphasis added) ("[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."); Kass, 91 N.Y.2d at 566 ("[I]n deciding whether an agreement is ambiguous[,] . . . [p]articular words should be considered[], not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby."); Atlas Partners, 2015 WL 4940126, at *5–6 (citing Madeleine, L.L.C. v. Casden, 950 F.Supp.2d 685, 696

---

[5] $Shares\ of\ Common\ Stock = \frac{(1{,}042{,}675)(2.50-11.50)}{2.50} = \frac{(1{,}042{,}675)(-9.00)}{2.50} = -3{,}753{,}630.$

[6] $Shares\ of\ Common\ Stock = \frac{(1{,}042{,}675)|2.50-11.50|}{2.50} = \frac{(1{,}042{,}675)(9.00)}{2.50} = 3{,}753{,}630.$

(S.D.N.Y. 2013)) ("[M]ultiple documents must be read together as a single contract when the 'plain language of the agreements unambiguously requires them to be read together.'").

As will be discussed in detail below, the context of the entire integrated agreement reveals the purpose of the cashless exercise mechanism, which in turn reveals that only Global Eagle's interpretation of the phrase "difference between the Warrant Price and the 'Fair Market Value'" is reasonable. See Orchard Hill, 830 F.3d at 156 ("A contract is unambiguous . . . if the contract language has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion."). The Court holds, therefore, that a cashless exercise is only available when the Fair Market Value exceeds the Warrant Price. In other words, the phrase "the difference between the Warrant Price and the 'Fair Market Value'" in section 7.4 must translate to ($Fair\ Market\ Value - Warrant\ Price$) such that the Warrant Price is always subtracted from the Fair Market Value.

A. The Warrant Agreement and Warrant Certificate Expressly Provide that One Warrant Entitles a Holder to One Share of Common Stock

First, the Warrant Agreement and the Warrant Certificate, together comprising of a total of 21 pages, provide in numerous locations that each warrant entitles the holder to purchase only one share of common stock, subject to specific and enumerated adjustments. For instance, in section 3.1, it states: "Each Warrant shall, when countersigned by the Warrant Agent, entitle the Registered Holder thereof, subject to the provisions of such Warrant and of this Agreement, to purchase from the Company <u>the number of shares of Common Stock stated therein</u>, at the price of $11.50 per share, subject to the adjustments provided in Section 4 hereof and in the last sentence of this Section 3.1." (Compl't, Ex. 1 § 3.1). The Warrant Certificate states that "[e]ach Warrant is initially exercisable for <u>one</u> fully paid and non-assessable share of Common Stock . . . subject to adjustment upon the occurrence of certain events set forth in the

Warrant Agreement." (Id., Ex. 1 at 15 (emphasis added)).  Additionally, in its third introductory paragraph, the Warrant Agreement states that "each [warrant] evidenc[es] the right of the holder thereof to purchase one share of common stock of [Global Eagle] . . . for $11.50 per share, subject to adjustment as described herein . . . ."  (Id., Ex. 1 at 2 (emphasis added)).

The Warrant Agreement allows adjustments to this one-to-one exchange ratio only in narrow circumstances, as described in section 4 of the Agreement and in the last sentence of section 3.1.  These circumstances include, for instance, where the number of outstanding shares of common stock is increased by a stock dividend or decreased by a consolidation.  (Id., Ex. 1 § 4 (enumerating scenarios warranting adjustment)).  Section 4 further states that where an event occurs "affecting [Global Eagle]" that is not addressed in the enumerated list of adjustments but "would require an adjustment to the terms of the Warrants in order to . . . avoid an adverse impact on the Warrants and . . . effectuate the intent and purpose of this [section]," Global Eagle shall appoint an "appraisal firm of recognized national standing" to determine whether an adjustment is necessary and the terms of such an adjustment.  (Id., Ex. 1 § 4.8).

These detailed provisions reveal that absent an enumerated scenario warranting adjustment or the input of an independent expert regarding the necessity of an adjustment, the parties intended to maintain the one-to-one exchange ratio.  Callahan has not alleged that any basis for adjustment has been satisfied.  Yet, Callahan's interpretation of section 7.4 would entitle him to 3,753,630 shares in exchange for only 1,042,675 warrants—i.e. 3.6 shares per warrant rather than one-to-one—without a principled reason.  To read the section 7.4 formula as Callahan proposes would be to render meaningless the provisions requiring a one-to-one exchange ratio unless a specific adjustment applies, namely sections 3.1 and 4.

### B. The Warrant Agreement Expressly Requires Payment of the Exercise Price to Exercise Warrants

Second, the Warrant Agreement explicitly defines a warrant as an instrument that grants a warrant holder the right to purchase shares of Global Eagle common stock at the exercise price, not the right to exchange warrants for shares without payment. As discussed, the third full paragraph of the Warrant Agreement states that a warrant "evidenc[es] the right of the holder thereof to purchase one share of common stock . . . for $11.50 per share . . . ." (Id., Ex. 1 at 2 (emphasis added)). Section 3 of the Agreement is titled "Terms and Exercise of Warrants" and describes the method by which a holder can exercise his or her warrants. (Id., Ex. 1 § 3). Here, again, the Agreement states that "Each Warrant shall . . . entitle the Registered Holder thereof, subject to the provisions of such Warrant and of this Agreement, to purchase from the Company the number of shares of Common Stock stated therein, at the price of $11.50 per share . . . ." (Id. (emphasis added)).

Under section 3.3, entitled "Exercise of Warrants," the first subsection, titled "Payment," describes the process of exercising a warrant as follows:

> Subject to the provisions of the Warrant and this Agreement, a Warrant . . . may be exercised by the Registered Holder thereof by surrendering it . . . with the subscription form, as set forth in the Warrant, duly executed, and by paying in full the Warrant Price for each full share of Common Stock as to which the Warrant is exercised and any and all applicable taxes due in connection with the exercise of the Warrant, the exchange of the Warrant for the shares of Common stock and the issuance of such Common Stock, as follows: (a) in lawful money of the United States; in good certified check or good bank draft payable to the order of the Company . . . or (d) as provided in Section 7.4 hereof.

The structure of section 3.3.1 makes clear that in order to exercise a warrant, a warrant holder must do two things: first, "surrender[]" the warrant and second, "pay[] in full the Warrant Price" for each share of common stock. The payment requirement may be satisfied in

- 13 -

the ways listed in subsections (a) through (d), which include through "lawful money of the United States," i.e. a cash transaction, or "as provided in Section 7.4," i.e. a cashless transaction. Thus, the language and structure of section 3.3 establishes that a "cashless exercise" as described in section 7.4 does not <u>forego</u> payment of the exercise price, but is merely an <u>alternative method</u> by which a warrant holder may make such payment.[7]

Thus, the formula for "cashless exercise" in section 7.4 makes sense only when interpreted as Global Eagle urges, namely that the term "difference" requires that the Warrant Price be subtracted from the Fair Market Value as follows:

$$Shares\ of\ Common\ Stock = \frac{(Number\ of\ Warrants)(Fair\ Market\ Value - Warrant\ Price)}{Fair\ Market\ Value}$$

Interpreted this way, the formula calculates the number of shares of common stock owed to a warrant holder after deducting enough shares to pay the exercise price. Specifically, subtracting the Warrant Price from the Fair Market Value, represented by the term "$(Fair\ Market\ Value - Warrant\ Price)$," yields the profit, in dollars, that a warrant holder would realize by exercising one warrant when the Fair Market Value exceeds the Warrant Price.[8]

---

[7] The Warrant Certificate similarly states that a "cashless exercise" is an alternative method of payment. It reads: "Each Warrant entitles the holder, upon exercise . . . to receive from the Company that number of fully paid and nonassessable shares of Common Stock as set forth on the reverse hereof, at the exercise price . . . as determined pursuant to the Warrant Agreement, payable in lawful money (or through '***cashless exercise***' if permitted by the Warrant Agreement) of the United States of America upon surrender of this Warrant Certificate and payment of the Exercise Price at the office or agency of the Warrant Agent referred to below. . . ." (Compl't, Ex. 1 at 16 (emphasis in original)).

[8] For instance, where the Fair Market Value is $13.50 and the Warrant Price is $11.50, a warrant holder engaging in a cash transaction would surrender the warrant and pay $11.50 for one share of common stock. Because the share itself is worth $13.50 on the open market and he has paid only $11.50 for it, he has made a profit of $2.00 by exercising that one warrant. The profit realized for exercising that one warrant is calculated by subtracting the

If we call this value "Profits Per Warrant," the numerator of the formula can be represented as "$(Number\ of\ Warrants)(Profits\ Per\ Warrant)$," i.e. the product of multiplying the Number of Warrants by the Profits Per Warrant. This product equals the total profits, in dollars, that a warrant holder would realize upon exercising all of his or her warrants. Dividing that product by the Fair Market Value in the denominator, converts the total profits from <u>dollars</u> to <u>shares</u> of common stock, thus yielding the total number of shares of common stock equal to the warrant holder's total profits. Thus, under Global Eagle's interpretation of the section 7.4 formula, a warrant holder engaging in a cashless exercise pays the Exercise Price by surrendering his warrants and walking away with only that number of shares of common stock equal to his total profits.

As demonstrated, under this interpretation, a "cashless exercise" becomes a means of effectuating payment of the exercise price without having cash or a cash equivalent change hands. This interpretation is thus consistent with section 3.3's description of a "cashless exercise" as an alternative to a cash transaction as a means of making payment.

Callahan argues that this interpretation is contrary to the intent of the parties because it "render[s] the 'cashless exercise' provision worthless." (Pl. Br. at 2). That conclusion is incorrect. The cashless payment method would be desirable when a cash transaction is unavailable, but a warrant holder still wishes to lock in his profits by exercising his warrants. A cash transaction becomes unavailable when Global Eagle does not maintain an effective registration statement, which is precisely the condition that triggers the availability of a cashless exercise under section 7.4. Global Eagle's interpretation thus allows a warrant holder to "cash

---

Warrant Price from the Fair Market Value, as represented by the expression "$(Fair\ Market\ Value - Warrant\ Price)$."

out" on his profits even when a cash transaction is not available, but only when those profits exist, i.e., when the Fair Market Value exceeds the Warrant Price.

In contrast to Global Eagle's interpretation, Callahan's interpretation allows a warrant holder engaging in a cashless transaction to obtain multiple shares of stock per warrant without making any sort of payment whatsoever, which is inconsistent with the requirement that a warrant holder pay the exercise price to exercise the warrants. He interprets the term "difference" in the section 7.4 formula to mean the distance between the Warrant Price and the Fair Market Value as follows:

$$Shares\ of\ Common\ Stock = \frac{(Number\ of\ Warrants)|Fair\ Market\ Value - Warrant\ Price|}{Fair\ Market\ Value}$$

Here, the distance between the Warrant Price and Fair Market Value, as represented by the expression "$|Fair\ Market\ Value - Warrant\ Price|$," does not equal the "Profits Per Warrant" as was the case for Global Eagle's formula. Where, as here, the Warrant Price exceeds the Fair Market Value, a warrant holder would suffer a loss if he exercised his warrant in a cash transaction because he would pay the Warrant Price to purchase a share of stock, which is a higher price than he could have paid by purchasing the share on the open market at Fair Market Value and thus higher than the price at which he could sell.[9] Yet, the distance between the Warrant Price and the Fair Market Value, i.e. "$|Fair\ Market\ Value - $

---

[9] For instance, where the Fair Market Value is $9.50 and the Warrant Price is $11.50, a warrant holder engaging in a cash transaction would surrender the warrant and pay $11.50 for one share of common stock. Because the share itself is worth $9.50 on the open market and he has paid $11.50 for it, he has suffered a loss of $2.00 by exercising that one warrant.

*Warrant Price*]," would still be a positive value.  Callahan has not suggested any principled reason to make the number of shares owed to a warrant holder dependent on the size of the gap between the Fair Market Value and the Warrant Price rather than dependent on the Profits Per Warrant.  His interpretation allows warrant holders to surrender warrants that are insufficient in value to cover the exercise price for shares of common stock, plainly contradicting section 3.3's requirement that a warrant holder pay the exercise price in order to exercise his warrants.

Moreover, based on Callahan's formula, as the Fair Market Value approaches zero, the number of shares owed to Callahan (or any warrant holder) would increase to the point of absurdity.  To illustrate, applying Callahan's formula and assuming an exercise price of $11.50, if the Fair Market Value were $1.00, the number of shares owed to Callahan would be 10,948,087.5.  If the Fair Market Value were $0.01, the number of shares owed would be 1,198,033,575.

Thus, to accept Callahan's interpretation would be to conclude that Global Eagle agreed that if the Fair Market Value dropped low enough, Callahan would be entitled over a billion shares of common stock for no payment and to the detriment of existing stockholders, whose interest would be severely diluted.  Such an outlandish consequence could not have been the intent of the parties, especially where the Warrant Agreement contemplated issuing "up to 20,125,000 warrants" and guaranteed that "[Global Eagle] shall at all times reserve and keep available a number of its authorized but unissued shares of Common Stock that shall be sufficient to permit the exercise in full of all outstanding Warrants issued pursuant to this Agreement." (Compl't, Ex. 1 at 2).

Under Callahan's interpretation, had Global Eagle issued the 20,125,000 warrants, and the Fair Market Value dropped to $0.01, Global Eagle would have to be prepared

to issue 23,123,625,000 shares of common stock to warrant holders for no payment. The Court declines to read the Warrant Agreement in such an "absurd [and] commercially unreasonable" manner. See Gebert, 2014 WL 1883551, at *3 (citation omitted).

CONCLUSION

Defendants' motion to dismiss (Doc. 36) is GRANTED. The parties' motion for oral argument (Doc. 41) is DENIED as moot. The Clerk is respectfully directed to terminate the motions.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
      May 30, 2019